The next case for argument is 25-1076, reVamped et al. v. City of Pipestone et al. All right, Mr. Erickson, we'll hear from you first. Good morning. Greg Erickson and Maxwell Becker on behalf of the appellants. I only have 10 minutes, so I'm going to get straight to it. On March 9th, Douglas Fortune came and to the Calumet Inn with deputies and shut the Calumet Inn down. When it did it, it placed a placard outside the building, which said this structure is unsafe and its occupancy has been prohibited by a code official, and then for its authority, it cited three provisions under authorization. Minnesota State Building Code 2015, Minnesota Rule 1300-180, and Minnesota Statute 463.15 and 463.16, and that's Appendix 158, Exhibit 7. In conjunction with that, a document was hand-delivered to Ms. Grubbs, the contract for deed Vendee of the Calumet Inn. In pertinent part, that document says, per the current Minnesota Building Code and State Fire Code, the hotel is condemned. There is no argument whatsoever that any pre-deprivation notice was provided of this condemnation, nor an opportunity to cure, an opportunity to be heard, or a civil court action. Your Honors, I've been a board certified real estate specialist for over 25 years. I've never seen anything like this. When I moved for summary judgment, I was sitting there going. Thanks for the testimony, but was it 10 days before anybody did anything, sent the letter to the counsel? Pardon? Was it 10 days before your clients, I assume, did anything at all by sending a letter to the counsel? You mean did anything in terms of response? Did they do anything during the 10 days after the posting of the closure order? They attempted to have people come in and fix things that the fire marshal had noted as a problem. The crux of this is . . . They continued remedy. Pardon? They continued to remedy and comply. That's correct, Your Honor. Which suggests, of course, that it hadn't been remedied and they weren't in compliance. Your Honor, there's a difference between having a code violation and having a building that is fundamentally unsafe. Those are two different things. Your Honors . . . Well, that's laden with ambiguity and disputable. I thought the case was not about whether they labeled the problem correctly, but about whether the closure was permissible. Well, that's correct, Your Honor. They condemned the building. Condemnation requires notice and an opportunity to be heard and a court order. None of those occurred before Doug Fortune came into our building and closed it. What says those things are required in advance? 463.15 . . . Well, that's a state law argument, but you brought a federal constitutional claim, as I understand it. Are you arguing a state law violation or a federal constitutional violation? What we're arguing is that failure to follow the explicit state condemnation statutes and the condemnation codes in the city of Pipestone also provide the same sort of notice and opportunity to be heard and necessity for a court order. Failure to follow those clearly established procedures result in a due process violation. That is a rare, a rarity in my experience. Well, Your Honor . . . Violations of noncompliance with state law typically does not establish a 1983 violation. Your Honors . . . Which you can label, as many lawyers do, you can label anything due process, but that doesn't make it so. Your Honor, what we established in the record is that there is a practice and procedure in the city of Pipestone to condemn properties without a court order and a notice.  So what? Well, Your Honor . . . I don't . . . We believe that's significant. Okay, address the . . . Go ahead. No, no. No, go ahead. No, no. No, it's okay. Would you address the Supreme Court's 1981 Hodel, I bet it is, Hodel case? Are you familiar with it? The mine case, I think it's a mine case. Yes, it's the mine case. The Secretary of Energy, Hodel. Your Honor, I'm not familiar with that. Okay, great, because the Supreme Court did allow immediate shutdown of a mine due to the great public interest. Let me explain something. There is a difference, and it is material, and this is where the district court erred. There is a difference between being able to vacate a building, which they had the authority to do, okay, under both city code and state law for the safety of the residents. There is a difference between an ability to vacate a building and an ability to summarily condemn a building. Those are two completely different things. What's the difference as a practical matter . . . As a practical matter. . . . if you have a post deprivation opportunity to challenge the condemnation? As a practical matter, it's . . . They didn't tear down the building, did they? No, Your Honor. What's the difference? The difference is when a building is condemned, the licenses to operate are immediately revoked. If you have a building and there is a bomb threat, and they vacate the building, and then they find out that there's not a bomb in the building, then you can go back in the building, no harm, no foul, we were mistaken, and the business can continue to operate. What happened here, according to the testimony of Jason Kloss . . . Were they prevented after the order was lifted? Were they prevented as unlicensed owners from going back in? Yes. Yes, they were not able to go in and operate the hotel. After they got relief? After the order was rescinded? That's correct. They did not have an order. They lost their lodging license. They lost their food and beverage license. All of those were lost. I thought they were not going to close until 2022. Well, they were able to get them back, but it was a year later. And by that point, the deterioration of the hotel has resulted in its closure. It ruined the business, Your Honors. A small business needs cash flow, okay? The interruption of that cash flow based upon a mistake, okay, for a week is survivable. For six months, it's not survivable. That's what state courts are for. Well, Your Honor . . . They sort those things out. Now we're talking about bringing the Federal Constitution into play. Well, we believe that completely ignoring clearly established state law is a constitutional violation. And in many . . . we have many cases saying to the contrary, particularly, for example, in prison condition cases. Noncompliance with prison policies or state laws bargarding prison policies do not get you in the 1983 door. Well, Your Honor, in this particular case, the noncompliance is willful. Is what? Willful, okay? It doesn't matter. Mr. Fortune was well aware of the fact that he needed court orders to condemn properties. He even published an op-ed under which he said, you know, that the state should not . . . We understand that point, but the concern is that the state sometimes can impose requirements that go beyond what's required by the Due Process Clause. So violating the state rule doesn't then automatically violate the Due Process Clause if it's overprotective. Now, you might be able to go to a state court and say, the man is willfully violating state law and we want the state court to order a reversal of the condemnation order, but apparently you didn't do that. You waited for the year to . . . is that right? Your Honor, what we believe is the constitutional violation is the willful refusal to give us a pre-deprivation hearing. What's your best case? Our best case is . . . I apologize, this is my second argument today. That's okay. If you don't have it in mind, it's probably in your brief. It is, Your Honor. But on this one-year point that you made about how it took a year to get the . . . isn't that what you said a minute ago, it took a year to get . . . It took many months, over six months to get the licenses back. So, it was really six months, not a year. Hold on. I want to ask how that worked. Was that because you went through the post-deprivation process that was allowed? No, Your Honor. What did you do to get the licenses back? When we filed a notice with the State, they immediately figured out that they had screwed up and removed the placards the next day, okay? But the problem with the condemnation is that the genie was out of the box, our licenses were revoked, our grandfathering was gone. When our grandfathering is gone, we have to reopen as a new business, basically. Not in every way, but in enough ways that crushed our ability to reopen. Why couldn't you reverse those things after the condemnation was withdrawn? Why couldn't you get the licenses back and get the grandfathering back? We did, but it took compliance because the testimony of Jason Closs is unequivocal. Jason Closs said, we're not condemnation lawyers. We operate, we see the word condemnation, we believe it. And so, he forced them to go through a bunch of hoops in order to reopen that in terms of time, finance, et cetera. It destroyed the business and killed it. And that's the sum and substance of our need for relief from this Court. We ask for a reversal and a remand for trial on damages. Okay. Understood. Thank you for your argument. Thank you. Mr. Reavers, we'll hear from you. May it please the Court, my name is Paul Reavers. I represent the City of Pipestone and its building official, Doug Fortune. We ask this Court to affirm the District Court's grant of summary judgment dismissing the procedural due process and takings claims in this matter. We have a decision by the building official that's authorized under Minnesota Rule 1300.0180. And there, the building official is specifically authorized by state law to close or vacate a building is the actual precise language. The statute doesn't use the word condemnation. I think that's a misnomer. Condemnation in what my colleague, I think, was referring to is there's a process under statute chapter 117, the typical condemnation process. This wasn't a condemnation where the City is trying to acquire this. The City closed it under this provision that allows the emergency closure for property that's a threat to life, health, or safety of the occupants. That was provided and that's some of the provisions that was cited in Mr. Fortune's letter. The state statute, the rules also have a specific procedure to appeal that. And that's under Minnesota Rule 1300.0230. It's a very quick procedure that allows within 10, you know, the statute actually requires if there's a local board of appeals within 10 working days for that to be held. But the statute also recognizes that many communities in the state of Minnesota don't have a board of appeals. And that's why the City Attorney directed these folks to appeal directly to the Department of Labor and Industry, the building official's decision. We have an order that was issued by the building official on March 10th that is lifted on COVID hits. The Governor's shutdown is days later. The building official, based on the actions and assurances of the building owner, lifted the vacation, the order, on April 30th. So we're talking a very limited, temporary closure. These folks were, well, they have a right, they actually were preparing. That's almost two months, you agree? I do. Do you know how many weeks it was in weeks? Yeah, I think I was doing the math. I think it's 50. No, don't worry. From March 10th to April 30th. Okay, it's okay.  Yeah. And so a very short, you know, closure based on that health and safety, or the safety concerns of the building official. And there's no dispute that they were not in compliance, right? There were pervasive code issues, so there's no dispute that there were problems. And it's pervasive problems, dating back to the fire marshal's initial order in 2019, at the end of the year, and putting this place on a fire watch because of concerns with the sprinkler system not working. We go forward into January of 2020, we have a fire where the sprinkler system does not activate. We have two children in that room. And it's fortunate that the on-duty manager was on that floor to put out that fire with the fire extinguisher. So we have these continuing issues. And then we have the inspection that was set up by the state fire marshal, or the deputy state fire marshal, accompanied by the Southwest Department of Human Services and the city building official. So the three of them. And based on that inspection, and the testimony in the record is that the building official made that determination, and again, he made the determination. And for procedural due process, the issue is, is there a process that allows them to challenge that decision? And there is. And the district court really did a nice job kind of walking through that, and this court has cited in a number of decisions, and I'll point the court to just two, the Eighth Circuit decision in Parrish v. Malinger, a 1998 Eighth Circuit case. And again, we're familiar with that. I'm still unclear on the facts, frankly. At the April 30, Fortune determined the calumet had remedies of code violations and condemnation order could be removed. And then it's asserted that the owner then delayed re-inspection until November 5. That's not really explained. And then she regained the relevant licenses to operate, and the building closed in 2022. Is there evidence in the record of what the hotel operations, when it reopened, and what was the, you know, occupancy and revenue between then and when it closed? I'm not asking for the facts. He's certainly not in the briefs.  No, I think what I can respond to, Your Honor, is that it was November 5, 2020, when they got the licenses reinstated. Now, again, the city... But what, did it not reopen before then? Well, they didn't have... So they need the restaurant and lodging license to operate as a hotel. That's not a city license. But the city, you know, the city lifted the, you know, the order on November or April 30th is when we issue that. They don't, they take until November 5th, and again, that's not the city. And now that's your fault, they say. That's the argument, Your Honor, but that's not... Now then, but then beyond that, when it reopened until it closed because you destroyed it, what's the evidence regarding operations? I, you know, Your Honor, I think that the... It's a summary judgment, and they had the burden to make their case. I know. What did they show? I think that the record demonstrates that this place never made money, is what... And we came out of... It started in the 1880s, didn't it? It did, but... Well, okay, that's not an answer. Well, Your Honor, I will suggest that... In the record here, we have COVID, right? COVID was devastating to the hotel and restaurant industry. Can I answer my... Is there... Can I look somewhere in the record and find out the occupancy rates and so forth? Your Honor... How you tell you how this kind of operation is doing? I do not believe that was submitted as part of the summary judgment order. I mean, there was... Well, it's in the record in the sense we had Daubert motions. There were motions to exclude expert, but those were moot. The court denied both. We had competing Daubert motions. I don't need an expert. I need the hotel records. What I'm getting at is that would be, to the extent it's in the district court record, that would be the only place it would be. And that's... Wait. So... What's the reason? Is there anything in the record about why it closed in 2022? Did they explain why it closed and why it took a year and a half for this destruction of the building to cause the operation to terminate? I believe the record is that they couldn't make it. It's as simple as that. That by April, they closed on April... Do they blame COVID or they don't say why? They blame the city. I know that, but at summary judgment, if I had been the judge, I'd want a little more than that. And they wouldn't get out of the courtroom until they provided it or said they can't. And they did not do that, Your Honor. On this timeline, you said March 10 was the order, and then you said the governor entered a closure order based on COVID sometime shortly thereafter? Correct. And was that still in place as of April 30? It was. And this is right at the beginning, if you remember. You're saying there would have been a closure regardless of the... Exactly. Starting with the COVID order. Exactly. And then when was that lifted? Do you remember? Certainly... Before November 5? It was after April 30. I can't remember. Before November 5? Yes. I think the rules changed after that, that the governor modified the rules related to hotel... What does the record show about why it took from April 30 to November 5 to get the licenses reinstated? Was that a delay by the state, or was that a delay by the building owner? That's a delay by the appellants, because it's their obligation to coordinate that reinspection. I know, but they could have been trying, and the state wouldn't do it. I'm trying to understand if it's clear whether it was diligent from the...  Go ahead. I'm sorry. I think the record's clear that the inspector was waiting for them, and they scheduled it for November 6. So he would have been there sooner if they would have asked. I think the record is clear on that testimony from that official, and I see my time is almost up, Your Honor. I would rely on the briefing for any other issues that the Court may have. And, again, I ask that this Court affirm the grant of summary judgment. Thank you. Very well. Thank you for your argument. Do you have any rebuttal? We'll give you one minute if you want to make a brief point. Your time has expired, but we'll hear one-minute rebuttal. Thank you, Your Honors. There is a huge amount of factual information contained in the affidavits, the declarations of Tammy Grubbs and Van der Smerkowski, and they go into excruciating detail as to what happened during that time period, the reasons for it, et cetera. There also is evidence in the record that the Pipestone community had a thriving hotel market, and all the hotels were full. But their big business is in the summer. We reopened in the fall and winter. It's dead. There's really no business in that time. They robbed us of our cash flow time from April to September, October, basically. The order was lifted April 30, though. How do you explain the delay? Because in the affidavits, it goes into excruciating detail. It's COVID. You couldn't get contractors. Why is that the city's fault? It's the city's fault because we would have been allowed to stay open had they not condemned the hotel. That's the problem. When they condemn it versus vacating it, it killed us. I thought there was a closure order. No, no, no. It's a condemnation. They told Jason Kloss, the health inspector, that the property was condemned. That's in the record. They told who? In his affidavit starting at page 9 going to about page 22. He said we never would have closed the hotel but for the condemnation, period. But didn't the governor order the hotels closed for a period of time? No, no, no. Didn't the governor under COVID order hotels closed for a period of time? Very brief time, and there were exceptions for medical personnel, which we catered to. But the fact of the matter is we had contracts with them. They were long-term tenants, medical personnel. Are you speaking from the record? Yeah, I'm speaking from the record. Go ahead. Did you want to ask more about it? All right. Thank you. Thank you for your argument. Thank you to both counsel. The case is submitted. The court will file a decision in due course. The court will be in a short recess and then resume with case number four.